IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **AMJAD FSEISI**,<br>1807 Cool Spring Drive<br>Alexandria, Virginia 22308<br><br>       Plaintiff,<br><br>v.<br><br>**O'KEEFE MEDIA GROUP**,<br>c/o PHS Corporate Services, Inc.<br>1313 N. Market Street, Ste. 1000<br>Wilmington, Delaware 19801<br><br>       and<br><br>**JAMES O'KEEFE**,<br>c/o PHS Corporate Services, Inc.<br>1313 N. Market Street, Ste. 1000<br>Wilmington, Delaware 19801<br><br>       and<br><br>**JANE DOE**.<br>Address Unknown<br><br>       Defendants. | Case No.  **1:25-cv-2368** |

## COMPLAINT

COMES NOW the Plaintiff, AMJAD FSEISI ("Mr. Fseisi"), by counsel, and moves for judgment against the Defendants, O'Keefe Media Group ("OMG"), James O'Keefe ("O'Keefe"), and an individual believed to be an OMG employee, Jane Doe ("Doe"), on the grounds and the amount hereafter set forth:

1

## JURISDICTION

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The parties are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court has personal jurisdiction over this action given that the tortious injury occurred in the Eastern District of Virginia.

## VENUE

3. Venue is appropriate under 28 U.S.C. § 1391(b)(2) as the tortious injury occurred in the Eastern District of Virginia.

## PARTIES

4. Mr. Fseisi is an individual and resident of the Commonwealth of Virginia. Mr. Fseisi has over 20 years of experience as an information systems security consultant at companies including Deloitte, Lockheed Martin, Northrop Grumman, and Booz Allen Hamilton. Throughout his career, Mr. Fseisi has worked with clients that include federal government organizations and agencies such as the Central Intelligence Agency ("CIA"), Office of the Director of National Intelligence, and National Security Agency.

5. Defendant O'Keefe is an individual and, upon information and belief, a resident of the state of Florida. O'Keefe is a conservative activist who founded the conservative media organization Project Veritas in 2010. After several defamation lawsuits, O'Keefe was removed as the group's leader in February 2023 due to financial malfeasance and founded O'Keefe Media Group, LLC just months later. A publicly-listed personal mailing address for O'Keefe is not available.

6.      Defendant OMG is a conservative media organization founded by O'Keefe in March 2023 following his removal from Project Veritas. OMG's stated mission is to "train and equip fearless citizen journalists and expose corruption" in the government, media, and industries. Since its founding, OMG has targeted mainstream media and progressive organizations through deceptively edited videos and sting operations.

7.      Defendant Jane Doe is a natural person and, upon information and belief, is an employee or associate of O'Keefe and/or OMG. The true legal name of Jane Doe, as well as her place of residence, is not known.

## FACTUAL BACKGROUND

### *Bumble Dating App*

8.      Bumble is an online dating platform that allows users to "swipe left" and "swipe right" on profiles of potential matches.

9.      Mr. Fseisi is single and uses dating applications, including Bumble to meet others.

10.     When signing up with Bumble, a user has to agree to Bumble's terms and conditions of use ("Terms"). Users must be over 18 years old, must use their real name and true age for both their account and profile, are not allowed to use another person's Bumble account or to share their Bumble account with any other person without permission and are responsible to ensure that any use of their account complies with the Terms. Notably, users are restricted from using Bumble in a manner that "impersonate or intends to deceive or manipulate a person (including, without limitation, scams and inauthentic behavior)", i.e., users are not permitted to misrepresent their identity.

11.     Bumble's Terms require users to agree to follow its community guidelines, which prohibits "Inauthentic Profiles" and makes clear that: "Bumble celebrates authenticity, and we

expect all our members to represent themselves accurately on their profile. We don't allow impersonation or misrepresentation on our platform. This includes catfishing (i.e. creating an online persona that isn't you) or falsely stating facts about yourself (including name, gender, age, and permanent location)."

12. Bumble's community guidelines also prohibit "Scams and Theft" which includes "any scam or theft activity intended to defraud or manipulate members out of financial or material resources. This includes requesting or seeking financial support, lying about your intentions for financial gain, or faking romantic intentions to deceive members out of financial or material resources."

13. On or around April 2024, Mr. Fseisi was contacted on Bumble by Jane Doe. Her Bumble profile listed her age as 32 years old, and Jane Doe identified herself as "Ashley Grace."

14. Jane Doe and Mr. Fseisi began exchanging messages using the Bumble platform. Jane Doe shared that she was a private tutor for high school students and asked Mr. Fseisi whether he worked in government. They shared phone numbers and began to text each other outside of the Bumble application. They continued with standard, casual texting as new acquaintances.

15. Shortly thereafter, Jane Doe requested that they meet in person and the two made plans to meet up the following week at Seamore's in Arlington, Virginia ("the First Date").

### The First Date

16. Mr. Fseisi and Jane Doe sat at a table inside the restaurant. The atmosphere was noisy, and Jane Doe asked Mr. Fseisi to repeat several things throughout their conversation.

17. Jane Doe kept her bag on the table pointed towards Mr. Fseisi and fiddled with her bag throughout their date.

18. Jane Doe and Mr. Fseisi began discussing their travels, backgrounds, and other topics typical in nature of a first date. Jane Doe shared that she grew up in the San Francisco Bay Area and attended the University of California, Berkeley before moving with her then-boyfriend to the Washington, D.C. area.

19. Throughout the First Date, Jane Doe represented herself as a liberal and spoke negatively of President Donald Trump. Jane Doe asked Mr. Fseisi which news outlets he read and whether he watched certain news shows. Mr. Fseisi stated that he enjoyed watching "The Rachel Maddow Show" on MSNBC, and Jane Doe shared that she also liked Ms. Maddow. Additionally, Mr. Fseisi told Jane Doe to read "The Mueller Report" and stated that his opinions came from reading the report.

20. Jane Doe repeatedly steered the conversation back to Mr. Fseisi's work. Specifically, Jane Doe pressed Mr. Fseisi for details relating to the exact nature of his work.

21. In response, Mr. Fseisi shared his own negative opinion on President Trump and proudly discussed his contract work without divulging classified information.

22. Jane Doe also solicited Mr. Fseisi's opinion on various hypothetical scenarios, such as whether government agencies could have withheld information from President Donald Trump.

23. In response, Mr. Fseisi shared his opinion that various individuals or agencies "could have" withheld information from President Trump.

24. The First Date lasted approximately 2 hours.

25. Following the First Date, Jane Doe shared that she found Mr. Fseisi handsome, that she loved their intellectual connection, and offered to cook for him in the future.

### *The Second Date*

26. On or around April 2024, Jane Doe and Mr. Fseisi proceeded to arrange another date at a restaurant in Falls Church, Virginia ("the Second Date").

27. During a phone call prior to the Second Date, Jane Doe insisted that many men she had previously dated were "liars" and requested that Mr. Fseisi bring his badge to their next date to verify his employment.

28. Yet again, Jane Doe brought a device throughout this date that permitted her to record video and audio footage of Mr. Fseisi without his knowledge or consent. Jane Doe again kept her bag on the table where she sat with Mr. Fseisi.

29. Jane Doe asked whether Mr. Fseisi had any knowledge of whether information was withheld from President Trump. In response, Mr. Fseisi stated his opinion that "anything is possible" and clarified that he had no purview into what information President Trump received or did not receive. When Mr. Fseisi attempted to change the conversation subject to another topic, Jane Doe would revert back to Mr. Fseisi's work and its nature.

30. Yet again, Jane Doe pressed Mr. Fseisi on whether information had been withheld from President Trump and who had withheld such information.

31. In response, Mr. Fseisi shared his opinion that he "believed" information had been withheld from President Trump.

32. Jane Doe also asked Mr. Fseisi whether President Trump was under surveillance.

33. In response, Mr. Fseisi shared his opinion that the National Security Agency or Central Intelligence Agency "could have" surveilled President Trump, but that he did not know how and could not give her a straight answer.

34. Mr. Fseisi noticed an orb-like object in Jane Doe's bag. Mr. Fseisi asked Jane Doe whether she was recording him.

35. Jane Doe vehemently denied recording him and insisted that she "would never do that."

36. Mr. Fseisi requested that Jane Doe open her bag.

37. Jane Doe objected and excused herself to use the restroom.

38. Upon returning from the restroom, Mr. Fseisi again requested that Jane Doe open her bag, and Jane Doe refused, stating that she had to leave.

39. Jane Doe left the restaurant and Mr. Fseisi sat at the table again.

40. The Second Date lasted approximately 2.5 hours.

### *O'Keefe Follows and Harasses Mr. Fseisi*

41. On or around April 2024, Jane Doe requested that Mr. Fseisi meet her in the Navy Yard neighborhood of Washington, D.C.

42. When Mr. Fseisi arrived at the agreed-upon location, he was instead confronted and followed by O'Keefe and several camera operators.

43. Confused, Mr. Fseisi attempted to return to his vehicle.

44. O'Keefe and his camera operators proceeded to follow and film Mr. Fseisi while badgering him with questions about his identity, work, and various statements made during the First and Second Dates with Jane Doe.

45. Mr. Fseisi repeatedly declined to identify himself and denied O'Keefe's various allegations until he reached his vehicle and was able to leave.

### *OMG Posts Defamatory Videos*

46. Upon information and belief, this was not the first time O'Keefe and OMG had used dating apps in order to target individuals as a part of their agendas. In fact, O'Keefe, OMG, and Jane Doe have specifically targeted public servants and/or perceived Democrats on at least

one other occasion, attempting to entrap them into making remarks on secret video recordings under false pretenses.

47. On or around May 1, 2024, OMG posted an edited version of the First and Second Dates ("the First Video"). The First Video is over 27 minutes long and is titled "VIDEO INSIDE CIA: Project Manager Says Execs and Directors of CIA Withheld Information From Trump." The First Video includes numerous cut and spliced together clips of Mr. Fseisi speaking while on the date with Jane Doe, as well as narration by O'Keefe. As of filing, the First Video has over 162,000 views, over 3,000 comments, and over 17,000 likes on YouTube. In the First Video, OMG and O'Keefe make numerous false and defamatory statements, including but not limited to the following:

   a. Falsely claiming that Mr. Fseisi engaged in "insubordination" and in "misrepresentation;"

   b. Falsely claiming that Mr. Fseisi "divulges on camera" that "high-ranking members of the intelligence community purposely colluded to withhold information from Donald Trump;" and

   c. Falsely claiming that Mr. Fseisi "states as fact that Trump is under constant surveillance" and that "they are spying on his ex-wife."

48. On or around May 3, 2024, OMG posted another video ("the Second Video"). The Second Video is titled "O'Keefe's Conversation With CIA Program Manager Amjad Fseisi Who Said CIA Withheld Info From Trump." The Second Video primarily consists of video clips of O'Keefe following Mr. Fseisi to his vehicle in Navy Yard while badgering him with questions and accusations, cut and spliced together with clips from Mr. Fseisi's encounter with Jane Doe. As of filing, the Second Video has over 66,000 views, over 1,500 comments and over 10,000

likes on YouTube. In the Second Video, OMG and O'Keefe make numerous false and defamatory statements, including but not limited to the following:

    a. Falsely claiming that Mr. Fseisi "admitted the CIA and intelligence agencies are committing crimes."

    b. Falsely claiming that Mr. Fseisi "withheld information from Trump."

    c. Falsely claiming that Mr. Fseisi "said Mike Pompeo, the Director of the CIA, withheld information from Trump."

    d. Falsely claiming that Mr. Fseisi "said Mike Pompeo was the Director of the CIA working with other heads of intelligence agencies to intentionally keep information from the president."

    e. Falsely claiming that Mr. Fseisi said that "intelligence agencies are being weaponized . . . for political purposes."

49. OMG also posted versions of the First and Second Videos on its various social media platforms, including Instagram and Facebook.

50. All of OMG and O'Keefe's statements, including but not limited to repeated claims that Mr. Fseisi divulged classified information, disclosed that President Trump was being surveilled, or was complicit in a widespread conspiracy to withhold information from President Trump, are all false.

51. OMG and O'Keefe's statements were shared widely, with thousands of individuals engaging with and amplifying the defamatory content on OMG and O'Keefe's website and on social media.

52. OMG and O'Keefe's false and defamatory statements were published with actual malice, as OMG and O'Keefe knew the statements were false or acted with reckless disregard for the truth.

53. Following OMG and O'Keefe's publication of the First and Second Videos, Mr. Fseisi's security clearance was flagged.

54. Mr. Fseisi only discovered that his clearance had been flagged when, after interviewing with Accenture and initiating a clearance crossover process, Accenture informed him that his crossover was not accepted. Mr. Fseisi spoke to the security director at Accenture and was informed that no reason was given as to why his clearance was not accepted, but that there was a flag on his clearance.

55. Mr. Fseisi called the CIA security office and was told that they were not allowed to speak with him on the subject.

56. This happened three more times with different job offers and companies. No one was able to inform Mr. Fseisi as to why his clearance did not cross over.

57. As a direct and proximate result of Defendants' defamatory statements, Mr. Fseisi has suffered:

   a. Severe emotional distress, humiliation, and depression necessitating psychiatric and psychological medical treatment;

   b. Fear and terror resulting from death threats directed towards him as a result of OMG and O'Keefe's defamatory statements;

   c. Damage to his personal and professional reputation, eight months of unemployment, numerous rescinded job offers, and the loss of professional relationships;

    d.   Financial losses due to impaired relationships, lost opportunities, rescinded job offers, and unemployment.

**COUNT I: FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

58.    Mr. Fseisi incorporates all prior allegations.

59.    At the behest of OMG and O'Keefe, Jane Doe knowingly and deliberately misrepresented herself to Mr. Fseisi for the purpose of targeting and entrapping him into making remarks that could be distorted for political and harmful purposes.

60.    Jane Doe presented a false version of herself through her Bumble profile and throughout the course of her interactions with Mr. Fseisi during their two dates. She deliberately misrepresented her intent in posting her profile on Bumble, which violated the terms and conditions and community guidelines by creating an "inauthentic profile." Jane Doe was not interested in seeking romantic connections, nor was she personally interested in Mr. Fseisi. She was simply part of an intentional targeted operation against individuals perceived to be Democrats to materially and falsely discredit them.

61.    Jane Doe's false representations were material to inducing Mr. Fseisi to engage with her through the Bumble App, communicating with her about potential dates, agreeing to go on two dates with her, and eliciting him to talk about himself in a manner he would not otherwise have done had he known her actual intent.

62.    The Defendants deliberately, and at all times, intended for Jane Doe to intentionally deceive Mr. Fseisi in order to obtain information which could be used to create damaging manipulated videos and articles to support the extreme political agenda of OMG and O'Keefe.

63. As a natural and proximate consequence of her fraudulent misrepresentations he has suffered serious mental distress, the loss of his employment, and substantial damage to his personal and professional reputation.

64. The Defendants are therefore liable for compensatory damages and punitive damages as the misrepresentation was egregious and malicious.

### COUNT II: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

65. Mr. Fseisi incorporates all prior allegations.

66. The Defendants conspired to have Jane Doe knowingly and deliberately misrepresent herself to Mr. Fseisi for the purpose of entrapping him into making inflammatory and damaging remarks. The Defendants arranged for Jane Doe to knowingly provide Mr. Fseisi with false information regarding herself, particularly with respect to her political views.

67. Defendants OMG and/or O'Keefe employed or contracted with Jane Doe for the purpose of targeting former or current civil servants such as Mr. Fseisi to entrap them into making inflammatory and damaging remarks that could be manipulated and sensationalized in videos that would be posted online. The Defendants conspired with each other to knowingly provide Mr. Fseisi with false information to secretly record his conversations and distribute selected excerpts and clips without his authorization.

68. The Defendants are therefore liable for compensatory damages and punitive damages as the Defendants acted with a reckless and/or callous indifference to Mr. Fseisi.

### COUNT III: VIOLATION OF 18 U.S.C. § 2511
### (Against All Defendants)

69. Mr. Fseisi incorporates all prior allegations.

70. Defendants recorded both dates and the ambush without the consent or authorization of Mr. Fseisi. Mr. Fseisi was not aware the dates were being recorded, and he objected numerous times to being recorded as part of the ambush by OMG and O'Keefe.

71. Notwithstanding Virginia being a one-party consent jurisdiction, 18 U.S.C.§ 2511 nonetheless prohibits the interception and recording of a communication if it was for the purposes of committing a tortious act.

72. At all times, the Defendants intended to obtain recordings of statements under false pretenses from Mr. Fseisi that would be manipulated, edited, and spliced together along with written comments that were designed to defame Mr. Fseisi, which is a tortious act.

73. The Defendants are therefore liable for actual damages, to include any profits made by the violations, along with punitive damages and attorney's fees and costs given the deliberate and outrageous nature of the resulting defamation and/or false light.

**WHEREFORE, the Plaintiff AMJAD FSEISI, respectfully requests that this Court:**

A. Award him an amount of damages to be determined at trial, but no less than $75,000;

B. Award reasonable costs and attorney's fees as provided in 28 U.S.C. § 2412(d) and any other applicable law;

C. Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and,

D. Grant such other relief as the Court may deem just and proper.

**TRIAL BY JURY IS REQUESTED.**

                                              **AMJAD FSEISI**
                                              By Counsel

**SUROVELL ISAACS & LEVY PLC**

By: */s/ Jason F. Zellman*
 Jason F. Zellman (VSB# 77499)
 Surovell Isaacs & Levy PLC
 4010 University Drive, Second Floor
 Fairfax, Virginia 22030
 Telephone: 703.277.9704
 Facsimile: 703.591.9285
 Email: JZellman@SurovellFirm.com
 *Counsel for Mr. Fseisi*